IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| $43,584.00 IN UNITED STATES ) | 8:08CV123 |
| CURRENCY, ) | |
| ) | MEMORANDUM AND |
| Defendant, ) | ORDER |
| ) | |
| LOUIS OBAD, ) | |
| ) | |
| Claimant. ) | |

An evidentiary hearing was held on January 8, 2009 on the Motion to Suppress (Doc. 25) and Motion to Dismiss (Doc. 26) filed by the Claimant, Louis Obad ("Obad").

The defendant currency was seized from Obad's rental car in a traffic stop conducted by the Nebraska State Patrol on January 19, 2008. In this action, the United States alleges that the currency was used or was intended to be used to commit or facilitate the commission of violations of 21 U.S.C. §§ 841 and 844 and is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

Obad contends the State Patrol conducted an illegal traffic stop and obtained physical evidence and statements from him in violation of his rights under the fourth, fifth, sixth, and fourteenth amendments to the United States Constitution.

The court finds that certain statements should be suppressed, but that the motions should be denied in all other respects.

## I. EVIDENCE

Nebraska State Trooper Aaron Watson testified that he is assigned to the traffic division, enforcing traffic laws on Interstate 80 in Kimball, Cheyenne and Deuel Counties. His training as a law enforcement officer began in August of 2000, and he was certified as an officer in January 2001.

At the Training Academy, he received instruction on the smell of both raw and burnt marijuana and has been exposed to both raw and burnt marijuana with some frequency during his career with the State Patrol. Watson received certification to operate a Stalker radar system in November 2003. As part of that training, Watson was required to visually estimate the speed of a vehicle to the degree of accuracy of plus or minus three miles per hour.

On January 19, 2008, Watson was working the morning shift, alone, in a marked patrol unit equipped with a Stalker radar unit and a VASCAR unit. He calibrated the radar unit at the beginning of his shift, and the tests showed that the unit was functioning correctly.

At 9:00 a.m., Trooper Watson was driving east on Interstate 80 near milepost 66 when he noticed a white Camry automobile traveling westbound in excess of 75 miles per hour, the posted speed limit. He visually estimated that the Camry was traveling 80 miles an hour. Watson then used his radar unit, which indicated that the Camry was traveling 82 miles per hour.

Watson turned around through the median, drove west on Interstate 80, caught up with the Camry within two miles, and stopped the car for speeding. While following the Camry, Watson noticed that it changed from the driving lane to the passing lane before signaling. The traffic stop was recorded, and the court has reviewed the videotape of the traffic stop (Ex. 1). The times of the events discussed below were taken from the videotape counter display.

The driver of the white Camry pulled over at 9:05:30 after Watson activated his emergency lights. Trooper Watson went to the passenger side of the Camry and noticed a suitcase in the back seat with what appeared to be an airport tag. Watson spoke to the driver through the passenger door. The driver, Louis Obad, was alone in the car. He asked why he had been pulled over. In response, Watson asked Obad to come back and have a seat in the patrol car and Watson would tell him the reason for the stop once they were in the patrol car (9:06:02). After Obad was seated in the patrol car, Watson could smell the odor of burnt marijuana upon his person, possibly masked by an air freshener.

Watson told Obad he had been stopped for speeding. The videotape shows that at 9:07:10, Obad told Watson he had set his cruise control at 80 miles per hour.

Because the registration showed that the Camry was a rental vehicle, Watson asked Obad to go back and retrieve the rental agreement so he could make sure that Obad was supposed to be in possession of the car and was a valid driver through the rental company.

At 9:07:30, Watson asked the dispatcher to run criminal history and driver's license checks. Watson was advised that Obad's license was valid, and he did not have a criminal history. Meanwhile, Obad retrieved the rental agreement from the Camry. Watson told Obad he intended to issue a warning ticket. (9:09:13).

The rental documents showed that Obad rented the Camry on January 17 and it was due back on January 24, 2008. Again noting the odor of burnt marijuana on Obad's person, Watson asked if Obad had been around any parties where somebody may have been smoking marijuana or if he had been around any marijuana recently. (9:09:45). He advised that he had not. According to Trooper Watson, Obad appeared to be visibly nervous at that time, exhibiting deep, heavier breathing and shaking hands. Watson believed Obad's nervousness was elevated. He had already told Obad he was going to be issued a warning for speeding; normally, in his experience, when people are told they are only going to get a warning ticket, they no longer appear to be so nervous.

While in the process of printing the warning ticket, Watson asked Obad where he was going and how long he was going to be there. Obad said he was going to Salt Lake City to see his brother for a couple days and then was going to go and see some friends in Las Vegas, Nevada, for a couple days. Watson then asked Obad about the rental agreement because Obad had already been on the road for two days, intended to spend two or three days with his brother, and several days with some friends, yet had only rented the vehicle

for a week. Obad replied that he worked construction; he was laid off in the wintertime, and he would probably just rent the car for a little bit longer because he didn't have to be back.

Trooper Watson asked Obad more about if there was anything illegal in the vehicle, such as marijuana, cocaine, amphetamines, or large amounts of cash over $10,000. Obad advised that there was nothing illegal in the vehicle; however, when asked whether the vehicle contained cash over $10,000, Obad turned away and did not look at Watson when he stated it did not. (9:12:20-40). Obad's change in demeanor raised Watson's suspicions.

Watson issued the warning ticket and returned Obad's documents. Throughout the conversation, Obad was polite and reserved, but nervous. He did not appear to be under the influence of alcohol or controlled substances.

After issuing the warning ticket, Watson asked Obad if he could search Obad's vehicle. Obad denied consent. At about 9:13:30, Watson told Obad he was going to contact a canine handler. Obad remained in the patrol car while Watson stepped outside to contact the dog handler.

Watson telephoned the police service dog handler, Russ Lewis, and asked Lewis to respond to mile marker 64, which is in Cheyenne County east of Sidney, Nebraska. He then got back into the patrol car. While waiting for Trooper Lewis to arrive, Watson talked to Obad, telling him that a canine handler was en route and would probably arrive shortly. Watson again asked Obad where he was going and his brother's name. Obad told Watson his brother's name, and the names of friends that he was going to see in Henderson, Nevada,

which is somewhere near Las Vegas. Obad said he did not know the directions to get to his destination and was going to be calling these people when he got there.

Between 9:13:30 and 9:18:00, "out of the blue," Obad told Watson that he liked to gamble a lot, so Watson asked if he had any money to go gambling with. Obad said he had "enough." When Watson asked him how much was enough, Obad said something to the effect that he wasn't really sure. When asked to "guesstimate" approximately how much money was "enough," Obad eventually told Watson that there was $40,000 in a bank bag in the suitcase (9:21:00). Watson testified he believed that documentation was needed in order to possess more than $10,000 in cash. He asked if Obad had any kind of documentation for the $40,000. Obad said he did not and said he was not aware of such a regulation. Obad said he received the money from his brother's partner, Tim Fazio, to go gamble with; Fazio owned property in New York and had a lot of money. Watson called Lewis again to tell him about the cash because it may have presented a safety issue in that a second vehicle might have been following Obad.

During the conversation, Watson also told Obad he believed he smelled marijuana on Obad's person. At approximately 9:30:12, Obad advised Watson that there was a marijuana roach in the center console area. He said he had smoked it the day before.

Trooper Watson admitted on cross-examination that Obad was not free to leave, as Watson had detained the Camry for further investigation and Obad was not allowed to be a pedestrian on the Interstate.

Trooper Russ Lewis was off duty when Trooper Watson asked him to come to the scene. Lewis testified that he put on his uniform, got the dog, and radioed to dispatch that he was beginning his tour of duty. Lewis testified that he and his service dog arrived at the scene of the traffic stop at 9:40 a.m. Lewis got out of his patrol unit and spoke with Watson, who said the driver had told him there was marijuana and approximately $40,000 in cash in the vehicle.

Lewis testified that he has been with the State Patrol since February 1998 and works as a public service dog handler. He has been a canine officer since June 2003. On the day in question, he was paired with a police service dog, a Belgian Malinois named Woody. Woody was a dual purpose dog, trained both in narcotics detection and patrol work. Lewis had been working with Woody since February 2005 and testified regarding the training process. Woody was trained to passively indicate to the odors of methamphetamine, marijuana, cocaine and heroin, i.e., Woody would sit and stare at the source of the odor until Lewis instructed him otherwise. Lewis and Woody completed the initial certification process in May 2005, had completed the routine monthly training requirements, and were re-certified annually. Their last certification prior to the January 19, 2008 traffic stop was awarded in November 2007.

After Lewis arrived with the dog, Watson asked Obad to step out of the front seat of patrol car, patted him down for weapons, and then placed Obad in the cage of Watson's patrol car for officer safety reasons, i.e., to separate Obad from the dog, and to prevent Obad

from opening a car door during the dog's search. (9:35:53) Obad was advised that he was not under arrest, and he was not handcuffed.

At about 9:37:47, Trooper Lewis proceeded to deploy the dog counterclockwise around the exterior of the vehicle, starting at the rear and circling the vehicle about two times. Watson testified he observed the dog sit at the trunk of the vehicle. Lewis testified that the dog provided an alert and indication on the rear of the vehicle, near the passenger side taillight, trunk seam area.

After the dog indicated, Watson removed the suitcase from the back seat of the vehicle and opened it. (9:39:40). He found a folded-over bundle of cash in the inside portion of the lid of the suitcase. He also found a pair of shoes, with each shoe containing two envelopes containing several bundles of cash. Lewis found the marijuana roach in the vehicle's interior.

After finding the cash, Watson contacted State Patrol Sergeant Greg Kallhoff, who is a liaison between the State Patrol and federal drug interdiction agencies. Kallhoff instructed Watson to have the cash transferred to a cashier's check and mailed to the federal agency in Omaha. Exhibit 5 is a copy of a cashier's check in the amount of $43,584.00 remitted by the Nebraska State Patrol and made payable to the U.S. Marshal Service.

Once the troopers confirmed there was marijuana and cash in the vehicle, they returned the suitcase to the vehicle and had a third trooper drive the vehicle to the State shop in Sidney, where it could be searched. Meanwhile, Watson advised Obad that he was not

under arrest, but did handcuff him for safety reasons. Watson transported Obad to the State Patrol's office in Sidney.

Trooper Watson acknowledged on cross-examination that he did not advise Obad of his *Miranda* rights any time between the time of the stop to their arrival at the State Patrol office in Sidney.

When they arrived at the State Patrol office, Watson took Obad into the office, removed the handcuffs, and introduced Obad to Investigator Eads. Eads proceeded to interview Obad.

While Eads conducted the interview, Watson returned to the vehicle, where he and Trooper Burr conducted a thorough search. They found the marijuana roach, the cash previously discovered in the suitcase, and a Bank of America bag containing 12 bundles of rubber-banded cash. They found a total of $43,584 in cash.

Watson testified that he assisted Trooper Lewis in conducting a "discretionary sniff" of the money. Lewis testified that the term discretionary sniff means placing a variety of objects in a search area for a dog and determining if any of the objects have the odor of narcotics on them. Lewis had secured two offices and cleared the rooms. Watson hid the $43,584 found in the suitcase in a desk drawer in one of the offices. He hid $200 of cash found on Obad's person in a separate office. Lewis, who did not know where the money was hidden, ran his dog through the two offices and advised Watson that the dog indicated to the $43,584 almost immediately, but did not indicate to the $200.

Obad was released with his personal belongings, the $200, and the Camry. The State Patrol kept Obad's cell phone and camera, the roach, the marijuana pipe, a duffel bag they found in the trunk, and the $43,584. They put the currency in evidence bags. Watson and Trooper Burr took the cash to Scottsbluff, where they met with evidence technician Greg Fullen and with Sergeant Brady.

Watson intended to issue Obad a citation for possession of marijuana and drug paraphernalia, but forgot to do so. Some time later, he sent the citation to Obad's address by certified mail. *See* Exhibit 110.

On January 24, 2008, Obad filed an application in the District Court of Cheyenne County, Nebraska, for the return of the $43,000, a cellular phone, a digital camera, and other personal property. *See* Exhibit 101. The state district court noted that, pursuant to Nebraska State Patrol policy, the currency seized from Obad was deposited in a local bank in return for a cashier's check issued to the U.S. Marshals Service and released to the Federal Drug Enforcement Administration on January 29, 2008. *See* Exhibits 101 & 111.

The Cheyenne County Attorney filed a criminal complaint on February 4, 2009, charging Obad with "knowingly or intentionally possess[ing] money used or intended to be used to facilitate the manufacturing, distributing, delivering, dispensing, or possessing with intent to manufacture, distribute, deliver, or dispense a controlled substance." The charge was dismissed eight days later, on the motion of the County Attorney. Exhibit 107.

On March 5, 2008, the state district judge granted Obad's application, finding that the State of Nebraska had not met its obligation under Neb. Rev. Stat. § 28-431 to timely file a petition for disposition of the currency. The court ordered Trooper Watson to return to Obad the $43,584, the cell phone, the digital camera, and all other items seized from him.

The United States filed this verified complaint for forfeiture on March 19, 2008. On April 1, 2008, the State of Nebraska moved to vacate the state court's judgment requiring the return of the money and property to Obad. The state district court granted the motion, vacating the judgment by order entered May 19, 2008, which explains:

> Nebraska statutes only allow the State ten (10) days after the seizure to decide whether to seek a forfeiture of property. Before the statutory ten (10) days passed Louis Obad requested the return of his money and other property. The 10 days passed and on the 10th day, the Trooper forwarded the money to the U.S. Marshal. The U.S. Attorney's office had indicated they would pursue forfeiture under the federal statutes. No action was filed in federal court until after the hearing in this Court.
>
> Mr. Louis Obad has the right to have his property returned to him unless the State can meet the necessary burden of proof for establishing it is contraband. Within ten (10) days of seizing the money and property, the federal officials had agreed to proceed in federal court and the State of Nebraska officials had sent the money to the U.S. Marshal. As this Court is now assured that Louis Obad has the opportunity to have a federal court determine whether the seized property should be returned this Court will vacate its order.
>
> The Order of this Court filed March 5, 2008, is vacated.

Exhibit 104. Obad's appeal is pending before the Nebraska Court of Appeals, *Obad v. State*, Case No. S-08-000703.

## II.  LEGAL ANALYSIS

**A.  Motion to Suppress**

In this civil forfeiture action, the evidence relied upon by the government is subject to the exclusionary rule, a mechanism designed to enforce the Fourth Amendment's guarantee to be free from unreasonable searches and seizures.  *See, e.g., United States v. $55,000.00 in U.S. Currency*, 2007 WL 2084145 at *2, Case No. 06-2447 (D. Minn., July 17, 2007) (citing *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000)).  Here, Mr. Obad challenges the legality of the initial traffic stop and contends the state troopers unlawfully expanded the scope of the traffic stop; therefore, all evidence obtained due to the expansion of the traffic stop should be suppressed.

> The controlling law is as follows:
>
> A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver.  *United States v. Olivera-Mendez,* 484 F.3d 505, 509 (8th Cir. 2007).  Incident to the stop, an officer is entitled only to conduct an investigation reasonably related in scope to the circumstances that justified the initial stop.  *United States v. Cummins,* 920 F.2d 498, 502 (8th Cir. 1990), *citing Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  The officer "may lawfully check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car."  *United States v. Brown,* 345 F.3d 574, 578 (8th Cir. 2003).  The officer "may detain the driver as long as reasonably necessary to conduct these activities and to issue a warning or citation."  *United States v. Jones,* 269 F.3d 919, 925 (8th Cir. 2001).  However, reasonable, articulable suspicion is necessary to expand the scope of the initial investigation.  *United States v. Payne,* 534 F.3d 948, 951 (8th Cir. 2008).

*United States v. Nasser*, 546 F.3d 569, 570 (8th Cir. 2008).

The court credits Trooper Watson's testimony that Obad was exceeding the 75 miles per hour posted speed limit, particularly in light of Obad's admission on tape that he had set his cruise control at 80 miles per hour. The court finds that the officer had probable cause to stop Obad for a traffic violation.

The law allowed Trooper Watson to detain Obad as long as reasonably necessary to perform the routine tasks related to the traffic violation and to issue a warning or citation. *See United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000); *see also United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *United States v. $404,905*, 182 F.3d at 643. An officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001)). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id*.

In this case, Watson continued to detain Obad after the warning ticket was issued, and approximately 25 minutes passed between the time Watson requested the service dog and the time the dog was deployed. The court finds that Trooper Watson had reasonable

suspicion to expand the scope of the traffic stop and detain Obad pending the arrival of the service dog. Obad himself smelled of burnt marijuana and continued to be excessively nervous even after he learned he was only going to get a warning ticket for speeding. Obad's demeanor had changed when asked whether the vehicle contained cash over $10,000. Obad's professed travel plans did not seem consistent with the terms of his car rental agreement.

While waiting for the service dog to arrive, Obad volunteered the information that he enjoyed gambling. During the conversation on that topic, he admitted he had $40,000 in his suitcase and that there was a marijuana "roach" inside the vehicle. Obad had not been advised of his *Miranda* rights[1] when he made those statements, and he contends the statements should be suppressed due to Watson's failure to administer *Miranda* warnings.

*Miranda* warnings are required when an individual is interrogated while in police custody. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999). Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Trooper Watson acknowledged that Obad was not free to leave the scene of the traffic stop. The court finds that Obad's freedom of movement was restricted to a degree akin to a formal arrest after the warning ticket was issued, and that Obad was "in custody" at that time for purposes of applying a *Miranda* analysis.

"*Miranda* protections are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

Upon review of the videotape, which includes the time Watson and Obad spent in the police cruiser waiting for Lewis to arrive with the dog, the court finds that Watson should have known that his words and actions were reasonably likely to elicit incriminating responses from Obad. Watson, at that time, suspected Obad of activities involving illegal drugs. It appears to the court that Watson's conversation with Obad was specifically intended to elicit incriminating statements regarding the presence of cash and marijuana in the rental vehicle, particularly after Obad volunteered the information that he enjoyed gambling. Although the subsequent conversation did not resemble a formal interrogation, Watson's statements became more pointed and more tailored to eliciting admissions from

Obad regarding the presence of marijuana and large amounts of money in his vehicle. Since Trooper Watson did not advise Obad of his *Miranda* rights, Obad's admissions that the vehicle contained a marijuana roach and over $40,000 will be suppressed.[2]

That said, Trooper Watson did have reasonable suspicion to detain Obad pending the arrival of the service dog. The dog alerted to the presence of an illegal substance and indicated at the rear of the vehicle. The significance of the dog's alert and indication is governed by *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir.), *cert. denied*, 127 S. Ct. 2954 (2007), in which the court said, "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." (Citing *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999)). The court finds that the reliability of the dog Woody has been established in that the dog was trained and certified to detect drugs, and Obad did not rebut or discredit the government's evidence on this point. The dog's alert provided probable cause to search the vehicle, and the defendant currency was lawfully seized from Obad's vehicle.

---

[2]To the extent Obad's motion seeks the suppression of physical evidence based on this *Miranda* violation, the failure to give a suspect *Miranda* warnings does not require the suppression of the physical fruits of the suspect's unwarned but voluntary statements. *United States v. Patane*, 542 U.S. 630 (2004). The record shows no indication of coercion or police misconduct in talking to Mr. Obad, and the court finds that all of Obad's statements were voluntary for purposes of applying *United States v. Patane*.

### B. Motion to Dismiss

Obad seeks a dismissal of this case for lack of jurisdiction based on the prior proceeding in the Cheyenne County District Court. He also contends the conversion of the currency into a cashier's check amounts to the destruction or suppression of exculpatory evidence.

#### 1. Effect of the State Court Proceeding

"It is 'well-settled law that only one court may have jurisdiction over the *res* in an *in rem* proceeding, and therefore the first court to obtain *in rem* jurisdiction maintains it to the exclusion of all others, whether that court be state or federal.'" *United States v. Timley*, 443 F.3d 615, 628 (8th Cir.), *cert. denied*, 549 U.S. 889 (2006) (quoting *Madewell v. Downs*, 68 F.3d 1030, 1041 n.13 (8th Cir. 1995)). The seizure of property by a state officer "does not establish exclusive state jurisdiction over the seized property preventing its voluntary transfer to federal authorities." *Madewell v. Downs*, 68 F.3d at 1042. "[O]nly a state forfeiture action or comparable *in rem* proceeding for disposition of the property will preclude federal forfeiture jurisdiction, making a transfer of the property in question to federal control an affront to state court jurisdiction and a violation of a claimant's due process rights." *Id*.

In this instance, no *in rem* proceeding for disposition of the defendant currency was ever commenced in state court. The first court to obtain *in rem* jurisdiction over the currency was the U.S. District Court for the District of Nebraska. "[W]here, as here, the

state court has ordered return of the *res* to the [claimant], that court no longer has any, let alone exclusive, jurisdiction over the *res*." *United States v. Timley*, 443 F.3d at 628.

Nor was it improper for the Nebraska State Patrol to transfer the money to a federal agency pursuant to 21 U.S.C. § 881(a). A federal agency may adopt the seizure of property seized by another agency as related to illegal drug use or trafficking, *Madewell v. Downs*, 68 F.3d at 1037, and "courts have long held that a federal agency's adoption of a seizure has the same effect as if the federal agency had originally seized the property on the date it was seized by the local authorities." *Madewell v. Downs*, 68 F.3d at 1039.

Regarding the State Patrol's conversion of the currency into a cashier's check, the Eighth Circuit does not distinguish between control of the actual currency seized and control of the funds representing that currency; rather, the currency actually seized is deemed fungible. *Madewell v. Downs*, 68 F.3d at 1042 n.14. "Currency, cashier's checks, and bank deposits are simply surrogates for each other, and in modern society are certainly regarded as 'fungible,' when the question is ownership of the funds each represents, although the court recognizes that the currency itself may have independent evidentiary value, as when it is tainted with drug residue and used for that reason as evidence of drug transactions." *Id.* A cashier's check is an appropriate, fungible surrogate for seized currency. *United States v. $46,588.00 in U.S. Currency,* 103 F.3d 902, 905 (9th Cir. 1996).

Turning to the claimant's argument that converting the currency into a cashier's check constituted the destruction of exculpatory evidence or spoliation of evidence,

> The United States Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The Government's failure to preserve evidence does not constitute a denial of a defendant's Fourteenth Amendment right to due process of law "unless the state acted in bad faith, the evidence had apparent exculpatory value and comparable exculpatory evidence was not reasonably available to the defendant." *United States v. Malbrough*, 922 F.2d 458, 463 (8th Cir. 1990) (citing *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). Thus, the failure to preserve potentially useful evidence is not a denial of due process unless a defendant can show that the state acted in "bad faith." *Trombetta*, 467 U.S. at 488; *see Youngblood*, 488 U.S. at 58 (finding no violation of the Due Process Clause of the 14th Amendment in a state prosecution where there "was no suggestion of bad faith on the part of the police").

*United States v. Webster*, 497 F. Supp. 2d 966 (S.D. Ia. 2007) (footnote and parallel citations omitted).

"The mere conversion of seized cash into check or money order form does not typically amount to destruction of evidence." *United States v. $433,980 in U.S. Currency*, 437 F. Supp. 2d 672, 683 (E.D.N.C. 2006). While it "behooves authorities to preserve seized money in the form in which they seized it when they intend to use it as physical evidence in a trial," *United States v. Thomas*, 319 F.3d 640, 645 (3d Cir. 2003), it is not necessary for the United States to use the currency as physical evidence to prove its case in a civil forfeiture trial. The record shows that the Nebraska State Patrol disposed of the defendant currency in accordance with its policies and procedures. This is not a criminal proceeding, and there is no evidence that law enforcement acted in bad faith by exchanging the seized currency for a cashier's check.

# ORDER

For the reasons discussed above,

**IT IS ORDERED:**

1. The Claimant's Motion to Dismiss (Doc. 26) is denied.

2. The Claimant's Motion to Suppress (Doc. 25) is granted as to the Claimant's admissions that he had $40,000 in his suitcase and that there was a marijuana "roach" inside the vehicle. The motion is denied in all other respects.

**DATED April 3, 2009.**

                **BY THE COURT:**

                **s/ F.A. Gossett**
                **United States Magistrate Judge**